UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. _____

ALFRED DAMUS and LEATRICE
DAMUS,

          Plaintiffs,

vs

ROYAL PALM MIAMI HOLDINGS,
LLC, a Florida limited liability company,


          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**09-21179**

**CIV - HUCK**

**COMPLAINT**  MAGISTRATE JUDGE
O'SULLIVAN

FILED by _____ D.C.
INTAKE

**MAY - 1 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

## NATURE OF THE CASE

     1.    Plaintiffs seek damages and other relief against defendant Royal Palm Miami Holdings, LLC under federal and state laws. The action includes claims under the Interstate Land Sales Full Disclosures Act, 15 U.S.C. § 1701 et seq., a strict liability statute enacted for purposes of protecting purchasers of residential properties. It also includes state law claims for fraud and for violation of Florida's Deceptive and Unfair Trade Practices Act. As alleged in detail below, Defendant engaged in unscrupulous and deceitful sales practices that induced Plaintiffs into a purchase and sale agreement and thwarted statutory protections designed to protect the Plaintiffs. Plaintiffs seek to rescind that agreement unlawfully procured by Defendant and to recover the deposits made by Plaintiffs in excess of $188,000. In addition, Plaintiffs seek compensatory and punitive damages, as well as other statutory relief as set forth more fully below.

## JURISDICTION AND VENUE

2.     Royal Palm Miami Holdings, LLC is a "developer" within the meaning of the 15 U.S.C. §1701(5), and is developing a residential condominium containing in excess of 340 units and various commercial units known as the Paramount Bay Condominium ("Paramount Bay"). The Paramount Bay is a "subdivision" within the meaning of 15 U.S.C. § 1701(3).

3.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to Plaintiffs' claims occurred within the Southern District of Florida.

## THE PARTIES

4.     Plaintiffs, Alfred and Leatrice Damus (hereinafter "Plaintiffs" or "Damus"), are husband and wife and reside in Miami-Dade County, Florida. At all times material hereto, Plaintiffs were "purchasers" of real property owned by Defendant located in Miami-Dade County, within the meaning of the ILSA, 15 U.S.C. § 1701(10).

5.     Royal Palm Miami Holdings, LLC ("Defendant") is a Florida Limited Liability Company registered under the laws of the State of Florida and with offices in Miami-Dade County, Florida. Defendant conducts substantial and ongoing business in Miami Dade County, Florida.

## BACKGROUND

6.     Historically, fraud and other misconduct by developers in connection with the marketing and sale of undeveloped plots of land, such as with condominiums, had occurred with enough frequency in the United States that Congress grew concerned. In 1968, Congress responded by enacting the Interstate Land Sales Full Disclosures Act, 15 U.S.C. § 1701 et seq ("ILSA"), consumer protection legislation whose underlying purpose is to prevent fraud by

requiring developers to inform buyers of facts which would enable them to make informed decisions about the properties they are purchasing before the sale.

   7. ILSA is a strict liability statute, at the heart of which is its disclosure requirements. The statute imposes a scheme of mandatory disclosures upon developers as the tool to protect purchasers. (See 15 U.S.C. §1701, *et seq*. and the regulations promulgated thereunder, C.F.R. §17001.1, *et* seq.). This scheme in effect removes a developers' discretion with respect to the information it provides by dictating precisely what developers must tell prospective buyers and the manner and format in which that information is to be disclosed. The failure to make such disclosures is a per se violation of ILSA that renders the sale voidable and entitles purchasers to recover a number of enumerated remedies. ILSA also prohibits fraud and other misconduct in connection with the sale of property.

   8. Under ILSA, the primary disclosure tools are the "statement of record," the "property report", and purchase and sale agreement. Before any sale is made, a developer must file a compliant statement of record and supporting documentation with the Department of Housing and Urban Development ("HUD") and provide the prospective purchaser a property report meeting the requirements of ILSA. Similarly, ILSA makes it unlawful to enter into a purchase and sale agreement that does not conform to ILSA's statutory and regulatory requirements.

   9. The sale at issue in this action is covered by ILSA.

   10. According to documents filed in the public record, Defendant's Paramount Bay was approved as a 496-foot, 46-story mixed use structure to be comprised of approximately 355 total multi-family residential units with recreational amenities, approximately 29,766 square feet of retail space, and approximately 452 total parking spaces. The projected cost of

construction was estimated at $150,000,000.00.

       11.    In or around May 2005, Defendant began offering units at the Paramount Bay for sale to consumers including the Plaintiffs.

       12.    In connection with the sale Defendant provided Plaintiffs a prospectus.  In its prospectus, Paramount Bay estimated that it would be completed with construction including finishing, equipping, and all planned improvements no later than November 15, 2008.

       13.    Defendant held itself out as having considerable experience in such matters touting, for example, the fact that Defendant had hired the world's best general contractor for construction.

       14.    Defendant also drafted and furnished Plaintiffs several purchase and sale agreements.  A copy of the first two purchase and sale agreements drafted by Defendant and furnished to Damus are attached as **Exhibits "A" and "B,"** respectively.

       15.    As reflected therein, on May 9, 2005, Defendant provided Plaintiffs a contract for the sale of Unit 1905 at the price of $940,000.  Defendant advertised Unit 1905 pre-construction as a desirable unit on the nineteenth floor of Paramount Bay.  At the time of the offer, agents of Defendant advised Plaintiffs that Unit 1905 was available and that Defendant would immediately "take the unit off the market" as soon as Defendant received a signed copy of the agreement and copy of a check for 10% of the sales price.  Plaintiffs signed the agreement and issued a draft that day and sent copies of both to Defendant, as requested.  See Exhibit "A."

       16.    After having advised Plaintiffs that Unit 1905 was theirs, Defendants, less than a week later, informed Plaintiffs that Unit 1905 was no longer available.  Defendant sent Plaintiffs another contract for a different unit -- Unit 1705 -- at the same price.  When Plaintiffs attempted to obtain information regarding the price of the sale of Unit 1905 and the range of

prices at which the other units were being offered and sold, they could not get the information.

17.     Shortly thereafter, Plaintiffs signed the second agreement for Unit 1705 that became effective May 31, 2005.  See Exhibit "B" attached.

18.     Both the first and second agreements furnished by Defendant provided in paragraph 9 (titled "Closing") that Defendant "shall substantially complete the Unit within three years after the Effective Date", or by May 31, 2008.

19.     Pursuant to the terms of the second agreement, Plaintiffs made a second deposit for an additional 10% of the sales price.  Between the two deposits, Plaintiffs paid Defendant a total of $188,000 in escrow, representing 20% of the total sales price for Unit 1705.

20.     On or around May 11, 2006, Defendant sent Plaintiffs yet a third purchase and sale agreement.  Defendant sent the agreement with the following representation:

> As you may recall, some time back we sent to you an amendment to your Purchase and Sale Agreement correcting the unit number designations [from 1705 to 1706].  **In connection with our construction loan, we will need to get your Purchase and Sale Agreement re-signed to correct the unit number designations as well as a couple of other non-material administrative items to our lender's satisfaction**.  Of course there are absolutely no changes to your unit or purchase price.  Therefore, kindly execute the enclosed Condominium Unit Purchase and Sale Agreement for your unit. . . .

(emphasis added).  A copy of the agreement dated May 11, 2006, and cover letter are attached as **Exhibit "C."**  The third agreement (hereinafter, the "Agreement") became effective May 31, 2006.

21.     Relying on the representations of Defendant that all changes were "non-material administrative" changes, Plaintiffs immediately executed the Agreement and sent a copy to Defendant.

22.     The project ensued, yet as of this date construction still is not complete.

23.     Plaintiffs have since learned that Defendant's representations regarding

the non-materiality of the changes to the Agreement were false and that the Defendant had, in fact, substantially altered the Agreement in a number of important ways, not the least of which was that Defendant, in paragraph 9 (titled "Closing"), had granted itself an additional *__three__* years within which to complete construction. Instead of a completion date of May 31, 2008, as provided in the second agreement, the Agreement now states: "Seller shall substantially complete the Unit within five (5) years after the Effective Date", or by March 31, 2011.

24.   Defendant's characterization of a three-year extension of a construction completion deadline as a "non-material administrative item" was false and misleading and served to induce Plaintiffs into signing the Agreement.

25.   Beyond that, Defendant altered the Agreement in a number of other significant respects. Defendant changed paragraph 18 (entitled "Purchaser's Default") of the two agreements in material ways. In the second agreement, Defendant had provided Plaintiffs a mere five (5) days within which to cure breaches.  In the Agreement, however, Defendant modified that paragraph to provide Plaintiffs a 20-day cure period -- a specific requirement of ILSA.  In other words, Defendant characterized a federally mandated disclosure obligation that Congress deemed material under ILSA as a "non-material administrative item."

26.   Defendant's characterization of these changes as "non-material administrative items" not only served to induce Plaintiffs into the Agreement but was designed to and did, in fact, conceal from Plaintiffs the very disclosure requirements for which ILSA was enacted.

27.   There were a number of other modifications to the Agreement, characterized by Defendant as "non-material administrative items" that Plaintiffs later learned were, in fact, changes necessary to make the Agreement conform to ILSA's disclosure

requirements.  Such conduct is reprehensible and embodies the type of unscrupulous sales practices that ILSA and the other consumer protection claims asserted herein seek to redress.

28.     Even so, the Agreement furnished by Defendant to Plaintiffs failed in many respects to meet the requirements of ILSA.

29.     Defendant's property report also failed to comply with ILSA, as set forth in detail below.  A copy of the property report furnished by Defendant to Plaintiffs ("Property Report") is attached as **Exhibit "D."**

30.     Plaintiffs have suffered damages.  The fair market value of Unit 1706 is in excess of $300,000 dollars less than the purchase price set by Defendant for that unit, and lower still than the price of Unit 1905.

31.     This complaint for, <u>inter alia</u>, injunctive and monetary relief constitutes Plaintiffs' notice of rescission or cancellation of the Agreement and, in the alternative, demand for damages in excess of $300,000, not including interest, punitive damages, attorneys' fees and other enumerated statutory remedies.

32.     The Plaintiffs were obligated to hire undersigned counsel and are obligated to pay attorney's fees and litigation costs for which the Plaintiffs seek reimbursement in these proceedings pursuant to the Agreement and applicable law.

33.     All conditions precedent to instituting this action have been satisfied or waived.

**Count I**
**<u>Violation of 15 U.S.C. § 1703(a)(1)</u>**

34.     Plaintiffs repeat and reallege paragraphs 1-33, as if set forth fully herein.

35.     This is an action for damages under sections 1703(a)(1) & 1709 of ILSA.

36.     At all times material hereto, Defendant offered, marketed, promoted and

7

sold condominium units at Paramount Bay to the public, through the U.S. Mail, telephone lines, and other instrumentalities of interstate commerce.

37.    Section 1703(a)(1) of ILSA makes it an unlawful sales practice:

***

(B) to sell or lease any lot unless a printed property report, ***meeting the requirements of section 1707 of this title***, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee; and

***

(C) to sell or lease any lot where any part of the statement of record or the property report contained an untrue statement of a material fact ***or omitted to state a material fact required to be stated therein pursuant to sections 1704 through 1707 of this title or any regulations thereunder***.

38.    In direct contravention of ILSA's clear disclosure objectives, the Property Report furnished by Defendant to Plaintiffs in connection with the sale of Units 1705, 1706, or 1905 did not comply with ILSA's disclosure mandates.  These failures included, but are not limited to:

a).    The failure to contain "the name and address of each person having an interest in the lots in the subdivision to be covered by the statement of record and the extent of such interest," as required by section 15 .US.C. § 1705(1).

b).    The failure to contain "a legal description of, and a statement of the total area included in, the subdivision and a statement of the topography thereof, together with a map showing the division proposed and the dimensions of the lots to be covered by the statement of record and their relation to existing streets and roads," as required by section 15 U.S.C. § 1705(2).

c).     The failure to contain "a statement of the general terms and conditions, including the range of selling prices . . . at which it is proposed to dispose of the lots in the subdivision," as required by section 15 U.S.C. § 1705(4).

39.     As noted, ILSA is a strict liability statute and each such material omission in the Property Report constitutes an independent violation of ILSA and renders the sale at issue unlawful and voidable.

40.     Beyond that, Defendant failed to comply with the applicable disclosure regulations promulgated under ILSA including, but not limited to:

a.)     24 CFR §§ 1710.100 and 1710.117 requiring a completed Cost Sheet listing major costs and expenditures that purchasers must make in addition to the sales price of the units.  The property report furnished by Defendant to Damus failed to contain this basic information;

b.)     24 CFR §§ 1710.100 and 1710.117 requiring an affirmation, to be executed by a senior officer authorized agent of the developer, affirming the contents of the Property Report.  Here too, Defendant failed to comply;

c.)     24 CFR §1710.109(a) requiring that Defendant list all restrictive covenants running with the land and zoning restrictions and ordinances.  In particular, Defendant failed to disclose a major use special permit application for the Paramount at Edgewater Square Project, filed for record July 14, 2005 in Official Records Book 23571, Page 3334, of the Public Records of Miami-Dade County, Florida (the "Resolution").  Similarly, Defendant neglected to disclose a covenant with the City of Miami pertaining to Paramount's Bay's obligation to, among other things, construct improvements, maintain, and repair the seawall adjacent to the project for protection against a 100-year flood ("Seawall Covenant").  The Resolution and

Seawall Covenant contain important restrictions, financial obligations, and governmental requirements and represent significant title related exceptions that Defendant failed to disclose to Damus;

       d.)    24 CFR Section §1710.212 requiring Defendant 1) to describe "the financing plan that is to be used in financing on-site or off-site improvements proposed in the Statement of Record"; 2) to provide an "[e]stimated date for full completion of amenities"; 3) a "[p]rojected date for complete sell out of subdivision"; and 4) a "[c]ost and expense recap for lots included in this Statement of Record."  The property report furnished by Defendant to Damus is devoid of any such information; and

       e.)    Various other governmental rules and regulations promulgated under ILSA.

41.    Such actions constitute <u>per se</u> violations of ILSA.

42.    As a result, Plaintiffs are entitled to rescind the Agreement and to a return of their deposit and/or to recover damages including damages relating to the decrease in value of Unit 1706.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant rescinding the Agreement and requiring the Defendants to repay the $188,000 in deposits made by Plaintiffs with interest or enter judgment for damages against Defendant in excess of $300,000, and for costs, attorneys' fees, and other such relief the court deems just and proper.

### Count II
### <u>Violation of 15 U.S.C. § 1703(a)(2)</u>

43.    Plaintiffs repeat and reallege paragraphs 1-42, as if set forth fully herein.

44.    This is an action for damages under Sections 1703(a)(2) & 1709 of ILSA.

45.     Section §1703(a)(2) makes it unlawful, with respect to the sale of any lot:

(A) to employ any device, scheme, or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; or

(D) to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed.

46.     Defendant's sales practices with respect to the Property Report, as set forth in paragraphs 38 through 40 above, and as further alleged below, constitute unlawful sales practices in violation of 15 U.S.C. §§ 1703(a)(2).

47.     Apart from its grossly non-compliant Property Report, Defendant falsely stated that it would "take the unit [1905] off the market" if Plaintiffs sent a copy of the signed agreement and deposit check to Defendant only to later learn that Unit 1905 was sold to another purchaser after Plaintiffs accepted Defendant's conditions.

48.     Defendant falsely stated that material and significant changes to the Agreement were mere "non-material administrative items" in order to induce Plaintiffs into signing the Agreement.

49.     Defendant falsely stated that material and significant changes to the Agreement were mere "non-material administrative items" in order to conceal a number of important statutory disclosure requirements mandated by ILSA for the Plaintiffs' protection.

50.     Even so, the Agreement did not meet ILSA's requirements:

a.)     Defendant failed to comply with Section §1703(b).  That section provides that "[a]ny contract or agreement for the sale or lease of a lot . . . may be revoked at the option of the purchaser or lessee until midnight of the seventh day following the signing of such contract or agreement or until such later time as may be required pursuant to applicable State laws, and such contract or agreement shall clearly provide this right."  Defendant failed to comply with this basic statutory requirement and instead utilized language that disguised Plaintiffs' unequivocal right to revoke the contract at their option and imposed additional conditions on Plaintiffs' right to revoke.

b.)     Defendant also failed to comply with 24 CFR § 1710.209(f)(3)(i), requiring Defendant to place "the following language . . . on the face or signature page above all signatures" in the Agreement.

> You have the option to cancel your contract or agreement of sale
> by notice to the seller until midnight of the seventh day following
> the signing of the contract or agreement.

51.     Defendant also represented "that roads, sewers, water, gas, or electric service, or recreational amenities would be provided or completed by the developer without stipulating in the contract that such services or amenities will be provided or completed", in violation of Section 15 U.S.C. 1703(a)(2)(D).

52.     Such actions violate 15 U.S.C. §§ 1703 (a)(2)(A-D) of ILSA.

53.     As a proximate cause of such violations, Plaintiffs have suffered damages and are entitled to rescission of the Agreement and other legal and equitable remedies.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant rescinding the Agreement and requiring that Defendant to repay the deposits made by Plaintiffs with interest or enter judgment for damages against Defendant in excess of

$300,000, and for costs, attorneys' fees, and other such relief the court deems just and proper.

### Count III - Fraudulent Inducement

54.     Plaintiffs repeat and reallege paragraphs 1-33, as if set forth fully herein.

55.     Defendant made the following material misrepresentations and/or omissions to the Plaintiffs:

a.)     Defendant falsely stated that it would "take the unit [1905] off the market" if Plaintiffs sent a copy of the signed agreement and deposit check to Defendant;

b.)     Defendant falsely stated that material and significant changes to the Agreement, such as with respect to the construction completion deadline, were mere "non-material administrative items";

c.)     Defendant falsely stated that material and significant changes to the Agreement, such as with respect to important statutory disclosures, were mere "non-material administrative items";

d.)     Defendant omitted to disclose to Plaintiffs the negotiations and existence of the Seawall Covenant with the City of Miami.  The Seawall Covenant contained important financial and construction obligations that exposed unit owners to substantially increased operating costs and assessments and increased the exposure of the units to liens, encumbrances, liability, and other matters; and

e.)     Defendant provided false and misleading information as to the completion date of the units in the prospectus and intended to and did in fact conceal from Plaintiffs the true facts about the construction completion deadline.

56.     At all material times hereto, the above omissions of fact and misrepresentations relate to information that Plaintiffs consider material and pertinent to making

an informed decision about the purchase. The above statements and omissions of fact were material and designed to induce and did in fact induce Plaintiffs to sign the Agreement. Had Plaintiffs known truth about the facts when such assertions were made, Plaintiffs would not have signed the Agreement or tendered the deposits.

57.    Plaintiffs reasonably and justifiably relied to their detriment on such statements and omission.

58.    At all times material hereto, Defendant knew or should have known that the statements were false when made and that the omissions made the transaction misleading.

59.    As a direct result of the aforesaid fraud, Plaintiffs have suffered damages substantial in nature, including monetary losses and other incidental and consequential damages, including without limitation, loss of the deposits and interest thereon.

WHEREFORE, Plaintiffs pray for judgment against Defendant for any and all damages recoverable under law, including but not limited to, the amount of the escrow deposits and incidental and consequential damages, punitive damages, attorneys fees, costs, interest, and such further relief as the Court may deem just and proper, such as rescission of the Agreement.

**Count IV**
**Violation of Florida Deceptive and Unfair Trade Practices Act**

60.    Plaintiff repeats and realleges paragraphs 1 through 59, as if set forth fully herein.

61.    This is an action under Florida's Deceptive and Unfair Trade Practices Act, § 501 et seq. ("FDUPTA").

62.    The definition of "trade or commerce" under FDUPTA includes the sale of condominiums, such as alleged above.

63.    ILSA proscribes unfair, deceptive, and unscrupulous acts and practices

14

and, as set forth in the paragraphs above, Defendant violated ILSA in many respects.

64.    Like ILSA, FDUPTA is designed to protect the consuming public, from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

65.    A violation of FDUPTA may be based upon "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

66.    Defendant's conduct and failure to comply with ILSA in the manner described above constitute per se violations of FDUPTA.   As described above, Defendant employed unfair and deceptive practices and unfair methods of competition in connection with the sale of Unit 1706.

67.    FDUTPA allows an aggrieved individual to "bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." Fla. Stat. § 501.211(1). Furthermore, "[i]n any action brought by a person who has suffered a loss as a result of a violation of [FDUTPA], such person may recover actual damages, plus attorney's fees and court costs. . . ." Fla. Stat. § 501 .211(2).

68.    Under FDUPTA, § 501.211(1), Plaintiffs are entitled to a declaratory decree that the sale at issue is voidable and subject to rescission and to recover actual damages, together with interest, court costs, and attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant rescinding the Agreement and requiring the Defendants to pay as damages the deposits made by Plaintiffs with interest thereon or enter judgment for damages against

Defendant in excess of $300,000, and for costs, attorneys' fees, and other such relief the court

deems just and proper.

DATED:  this 1st day of May, 2009

Respectfully submitted,

Paul Augustus Capua, Esq
CAPUA LAW FIRM
*Attorneys for Plaintiffs*
701 Brickell Avenue
16th Floor
Miami, Florida 33131
pcapua@charter.net
Tel: (786) 301-8008

By: _____
Paul A. Capua
Florida Bar No. 68500

F:\WDOX\CLIENTS\60027\5001\00042417.DOC

EXHIBIT "A"

From:

    Dr. & Mrs. Alfred Damus
    8145 SW 53 Ave.
    Miami, FL. 33143
    305 667 7671


To:

    Juliet Gold, PA
    Majestic Properties
    1682 Jefferson Ave.
    Miami, FL 33139


Total Pages: 6


Hi Juliet,

Here is the information you need re: the Paramount Bay Purchase,  plus a copy of the check # 4582 in the amount of $94,000.-.  Please let me know if you need any additional info at this time.

Thank you for your help.

Best Regards,

Al Damus, MD

**Paramount Bay, A Condominium**
**Condominium Unit Purchase & Sale Agreement**

**Oral representations cannot be relied upon as correctly stating the representations of Seller. For correct representations, reference should be made to this Agreement and the documents required by Section 718.503, Fla. Stat. (2005), to be furnished by Seller to Purchaser or a lessee.**

**Any payment in excess of 10 percent of the Purchase Price made to Seller prior to the Closing pursuant to this Agreement may be used for construction purposes by Seller.**

This Condominium Unit Purchase & Sale Agreement (this "**Agreement**"), dated to effective as of the Effective Date, is made by and between **Royal Palm Miami Holdings, LLC**, a Florida limited liability company whose address is 1499 West Palmetto Park Road, Suite 200, Boca Raton, Florida 33486-3321 ("**Seller**"), and

Purchaser's name: _Alfred Damus_

Purchaser's local address: _8145 SW 53 Ave_

_Miami Fla 33143_

Purchaser's permanent address: _8145 SW 53 Ave._

_Miami FL 33143_

Purchaser's Social Security Number: _610 36 0820_

Purchaser's local telephone: _305 667 7671_

Purchaser's permanent telephone: _305 667 7671_

Exact name(s) in which title will be taken: _Alfred and Beatrice Damus_

hereinafter called "**Purchaser**."

Now, Therefore, in consideration of the mutual promises set forth in this

Agreement, and other good and valuable consideration, Purchaser and Seller agree as follows:

1.     **Unit to be Sold**.  Seller agrees to sell and convey to Purchaser that certain condominium parcel described as Unit **1905**, Paramount Bay, A Condominium (the "**Unit**"), together with an undivided share in the Common Elements and other appurtenances to the Unit as described in the Declaration of Condominium for Paramount Bay, A Condominium (the "**Declaration**"), the Prospectus, and related condominium association documents to be recorded in the Public Records of Miami-Dade County, Florida (collectively, the "**Condominium Documents**").  Purchaser agrees to purchase and accept the Unit on the terms and conditions set forth in this Agreement, and subject to all of the provisions of the Declaration and the other Condominium Documents.  The sale of the Unit shall include the assignment of the exclusive right to use one automobile parking space, which parking space shall constitute a portion of the Limited Common Elements as further described in the Declaration; Purchaser may purchase the exclusive right to use one or more additional parking spaces, to the extent such spaces are available.

2.     **Purchase Price**.  The total consideration to be paid by Purchaser to Seller for the Unit (the "**Purchase Price**") shall be determined as follows:



    (a)   Unit Base Price:                   $

940,000.00

    (b)   Additional Upgrades enumerated in **Exhibit A** and incorporated herein:   $

    (c)   **Purchase Price**:                 $

940,000.00

The Purchase Price shall be subject to the prorations, offsets and other fees specified in Section 10 and elsewhere in this Agreement.

3.     **Payment Terms**.  Purchaser shall pay the Purchase Price in accordance with the following payment schedule:

    (a)   Initial partial payment of Escrow Deposit, due upon execution and delivery of this Agreement (first 10 percent of the Purchase Price):   $

94,000.00

    (b)   Balance of Escrow Deposit, due on or before the seventh (7th) day after receipt of notice that construction has begun (second 10 percent of the Purchase Price):   $

94,000.00

    (c)   Balance of Purchase Price, by cashier's check or electronic funds transfer, due at the Closing:   $

752,000.00

(d)     **Total Payments**:                                                    $
        940,000.00

The combined payments described in and required by paragraphs 3(a) and (b) shall be held as security for the performance of Purchaser's obligations pursuant to the terms and conditions of this Agreement (the "**Escrow Deposit**"). The balance of the Purchase Price due at the Closing, as described in and required by paragraph 3(c), shall be subject to adjustment for prorations and expenses as described elsewhere in this Agreement. Purchaser shall make all payments due under this Agreement in immediately available funds, payable in U.S. currency.

4.     **Upgrades**. Seller must acknowledge and agree to all upgrades, if any, requested by Purchaser pursuant to an addendum attached to this Agreement as **Exhibit A** (the "**Upgrades**"). The cost of each of the Upgrades shall be determined by the published Schedule of Upgrade List Prices, as prepared by Seller. If Seller omits any of the Upgrades requested by Purchaser, Seller shall only refund to Purchaser the amount that Purchaser paid to Seller for each of the Upgrades so omitted. Except for such omissions, Purchaser's payment for any of the Upgrades shall not be refundable, even if this Agreement is otherwise terminated in accordance with its terms by Purchaser.

5.     **Escrow Deposit**. The Escrow Deposit shall constitute twenty percent (20.00%) of the Purchase Price, payable as described in this Section 5. Purchaser shall deliver the first Escrow Deposit payment, constituting ten percent (10.00%) of the Purchase Price to Seller, together with a counterpart of this Agreement fully executed by Purchaser. Purchaser shall deliver the second Escrow Deposit payment, constituting an additional ten percent (10.00%) of the Purchase Price, to Seller on or before the seventh (7th) day after receipt of notice that construction of the Paramount Bay project has begun; thereafter, Escrow Agent may release all Escrow Deposit funds in excess of ten percent (10.00%) of the Purchase Price to Seller, which Seller may use for construction purposes. The balance of the Escrow Deposit funds shall be held until the Closing, or the earlier termination of this Agreement, by Terra Title Corporation, 701 West Cypress Creek Road, Suite 303, Fort Lauderdale, Florida 33309-2045, Attention: Steven R. Amster, Esq. ("**Escrow Agent**"). Escrow Agent shall place the undisbursed Escrow Deposit funds in an interest-bearing account at a depository institution insured by the Federal Deposit Insurance Corporation and located in either Broward or Miami-Dade County, Florida. Thereafter, Escrow Agent shall hold and disburse the Escrow Deposit funds pursuant to the terms and conditions of this Agreement, as well as pursuant to the terms and conditions of the Escrow Agreement by and between Seller and Escrow Agent (the "**Escrow Agreement**"). By Purchaser's execution of this Agreement, Purchaser covenants and agrees to be bound by and to abide by the terms and conditions of the Escrow Agreement. Purchaser may, upon request, obtain a receipt from Escrow Agent for the Escrow Deposit. Subject to the terms and conditions of the Escrow Agreement, Escrow Agent shall hold and disburse the Escrow Deposit in accordance with the following:

(a)     If Purchaser properly terminates this Agreement in accordance with its terms and conditions, Escrow Agent shall disburse all Escrow Deposit funds to Purchaser.

(b)     If Purchaser defaults in the performance of its obligations under this Agreement, Escrow Agent shall disburse all Escrow Deposit funds to Seller.

(c)     If the Closing of the purchase-and-sale transaction contemplated by this Agreement is consummated, Escrow Agent shall disburse all Escrow Deposit funds for application against the Purchase Price.

6.     **Cash Transaction**.  Purchaser shall deliver the balance of the Purchase Price in immediately available funds at the Closing, by cashier's check drawn on a Broward or Miami-Dade County institution or by electronic funds ("wire") transfer; Purchaser acknowledges and agrees that neither an official check nor a personal check is an acceptable alternative means of payment.  Purchaser's obligation to purchase the Unit shall not be contingent or conditioned upon Purchaser's obtaining financing.

7.     **Amendment of Condominium Documents**.  Seller reserves the right to make such changes in any of the Condominium Documents as governmental regulatory authorities, title insurance companies, or mortgage lenders may require, provided that such changes do not: materially alter the configuration, size, or boundaries of the Unit; materially alter the appurtenances to the Unit; change Purchaser's undivided interest in the Common Elements and the Common Surplus, or Purchaser's share of the Common Expenses; or otherwise materially alter the rights of Purchaser or the value of the Unit. Seller shall send written notice to Purchaser of all changes or amendments.

8.     **Plans & Construction**.  Seller agrees to construct the Unit in substantial and material conformity with the plans and specifications on file in Seller's office, which Purchaser may inspect upon reasonable notice.  Purchaser acknowledges that Seller has made available the plans and specifications for the Unit and the Condominium for inspection by Purchaser.  Purchaser acknowledges that the Unit may be the reverse or mirror image of the floor plan of any model shown in Seller's sales brochures or other promotional materials.  Purchaser acknowledges that the dimensions shown in Seller's plans, and in any sales or promotional materials are approximate and may change due to field conditions.  Purchaser acknowledges that any existing model Unit may contain items or special features which are not included in Purchaser's Unit, such as furnishings and decorations, accessories, special window treatments, upgraded carpeting and flooring, special wall treatments, upgraded fixtures and special lighting effects, and extra appliances.  Purchaser understands and acknowledges that the Purchase Price only includes the construction of Purchaser's Unit pursuant to Seller's plans and specifications, standard items specified in Purchaser's sales brochures, and any Upgrades ordered by Purchaser and enumerated in an Addendum attached to this Agreement.  Seller shall have complete discretion in "finishing details," including, without limitation, the exterior of the buildings, landscaping, amenities, and beautification of the Condominium.

9.     **Closing**.  If the Effective Date of this Agreement occurs before or during construction of the Unit, the parties shall consummate the Closing no later than ten (10) days after Seller's transmittal to Purchaser of notice that a certificate of occupancy has been issued for the Unit.  The issuance of a conditional, temporary, partial or final certificate of occupancy shall be deemed to be conclusive evidence that the Unit is substantially complete, and, thereafter, time shall be of the essence regarding the

performance of the parties' respective obligations under this Agreement. In all events, Seller shall substantially complete the Unit within three years after the Effective Date. If a certificate of occupancy has been issued for the Unit on or before the Effective Date, the parties shall consummate the Closing on or before the forty-fifth (45th) day after the Effective Date. If Purchaser fails to close in accordance with the requirements of this Section 9, this Agreement shall become null and void, and at the option of Seller, Purchaser shall forfeit all Escrow Deposit funds and Upgrade fees previously paid in accordance with Sections 3, 4 and 5. The Closing shall be consummated in accordance with the following:

        (a)    The Closing shall be held at the Condominium sales office located at 2066 North Bayshore Drive, Miami, Florida 33137-5124, or at such other Miami-Dade County, Florida location as Seller may designate. Seller shall inform Purchaser of the designated date of the Closing in a written "notice of closing" sent to Purchaser at least ten (10) days prior to the scheduled date of the Closing. The notice of closing shall be effective on the third (3rd) business day after its mailing, and an affidavit of Seller's employee or agent that such notice was mailed shall be conclusive evidence of its mailing. If Purchaser causes any delay beyond the scheduled date of the Closing, as determined by this paragraph 9(a), Purchaser shall pay interest at the annual rate of eighteen percent (18.00%) on the Purchase Price for the period of such delay, in addition to the Purchase Price. Notwithstanding Purchaser's payment of interest as described in the preceding sentence, Seller may declare Purchaser to be in default at any time after the scheduled date of the Closing, pursuant to Section 18, if Purchaser fails to consummate the Closing for any reason.

        (b)    Purchaser shall pay the balance of the Purchase Price in immediately available funds as described in Section 6.

        (c)    Seller shall convey fee-simple title to the Unit by means of a special warranty deed, subject only to the title exceptions identified in Section 10 below and other matters for which Seller shall obtain affirmative title insurance coverage. Seller shall assign the exclusive right to use at least one automobile parking space by means of an assignment of limited common elements (subject to availability, Purchaser may purchase the exclusive right to use one or more additional parking spaces). At the Closing, Seller shall provide Purchaser with a settlement statement (Form HUD-1) and a standard form of "Seller's Affidavit" that shall include a statement that Seller is not a "foreign" person as such term is defined in 26 U.S.C. § 1445, and the Treasury Regulations promulgated thereunder.

        (d)    *Ad valorem* real property taxes and assessment installments for the year of the Closing shall be prorated between Purchaser and Seller as of 12:01 a.m. on the date of the Closing, and the respective credit or debit to each of Seller and Purchaser shall be shown on the Settlement Statement.

        (e)    Seller shall provide the special warranty deed, the other closing documents, and the owner's policy of title insurance. Seller shall pay for the preparation of the deed, the other closing documents and the title policy, the title examination costs and the premium attributable to such policy, as well as Seller's

own attorneys' fees and costs.

(f)     In addition to the Purchase Price, Purchaser shall pay one and one-half percent (1.50%) of the Purchase Price as a **"Closing Fee"** to Seller to offset various administrative costs and expenses of marketing and development, and to cover the costs and expenses of the Closing, including, without limitation, the preparation of the special warranty deed and other closing documents; the recording fees and documentary stamp tax due upon the recording of the special warranty deed; the premium for the owner's policy of title insurance; and other organizational costs.

(g)     Purchaser shall pay all costs of obtaining a mortgage loan, including the documentary stamp tax and intangible tax due on such note or mortgage, the premiums for a mortgagee's policy of title insurance and related endorsements, an additional $500.00 loan closing fee payable to Escrow Agent, and the attorneys' fees and costs of Purchaser and Purchaser's lender, if any. If Purchaser is unable to physically attend the Closing, Purchaser shall pay all additional courier fees and telecopier charges that Seller or Escrow Agent incurs as a consequence.

(h)     If Purchaser intends to acquire the Unit with the assistance of a federally-guaranteed mortgage loan, Purchaser may purchase an owner's policy of title insurance from any title company of Purchaser's choosing. Pursuant to paragraphs 9(e) and (f), Seller agrees to pay for and furnish an owner's policy of title insurance through Escrow Agent, acting as the title agent for Attorneys Title Insurance Fund, Inc. or Commonwealth Land Title Insurance Company. If Purchaser elects to obtain title insurance through a title agent other than Escrow Agent, the Closing Fee shall be reduced by the minimum promulgated rate for issuing an owner's policy of title insurance for the Unit. However, in such case, Purchaser shall be responsible for paying Seller an additional closing fee of Four Hundred U.S. Dollars ($400.00) to partially reimburse Seller and Escrow Agent for the additional costs, expenses and fees that they will incur to coordinate and close the sale of the Unit through a third-party title and closing agent. If Purchaser chooses this option, Purchaser must notify Seller in writing, at the time Purchaser executes and delivers this Agreement to Seller or within fifteen (15) days thereafter, of the name and address of the title agent that Purchaser has selected and acknowledging Purchaser's obligation under this Agreement to pay the $400 additional closing fee. If such written notice is not transmitted to Seller in accordance with the preceding sentence, Purchaser shall be deemed: (i) to have selected Escrow Agent as the title agent through which title insurance shall be issued; and (ii) to have agreed to pay the full Closing Fee to Seller, in which case Seller shall be responsible for paying the premium for an owner's policy of title insurance in the face amount of the Purchase Price pursuant to paragraph 9(e).

Purchaser's initials: _____     Purchaser's initials: _____

(i)     Purchaser shall pay a prorated share of the current calendar month's Assessment installment and one additional month's Assessment installment in advance. In addition to all other amounts payable under this

Agreement, Purchaser shall also make a contribution to the working capital of the Association equal to three times the monthly Assessment installment due from the owner of the Unit; this working capital contribution shall not be credited against Purchaser's obligation to pay future Assessment installments.

10.    **Title**. Seller shall provide a title insurance commitment to Purchaser at least seven (7) days before the Closing, showing that Seller has good and marketable fee-simple title to the Unit, insurable by a nationally recognized title insurer at its promulgated rates, subject only to the following title exceptions:

(a)    real estate *ad valorem* taxes and assessment installments for the year of the Closing and subsequent years;

(b)    easements existing and to be created for ingress and egress to and from the Condominium Property, and for utility service lines, parking and other purposes;

(c)    conditions, restrictions, limitations and mineral rights of record;

(d)    zoning and land use regulations applicable to the Condominium Property;

(e)    the covenants, conditions, restrictions and easements set forth in the Declaration, including without limitation, the covenant to pay Assessments;

(f)    the provisions of the Condominium Documents, including without limitation, the Articles of Incorporation, the Bylaws and the Rules & Regulations;

(g)    the standard Florida form exceptions for any adverse ownership claim by the State of Florida by right of sovereignty, including submerged, filled and artificially exposed lands;

(h)    the mortgage, if any, executed by Purchaser in favor of a mortgage lender to finance Purchaser's acquisition of the Unit;

(i)    construction liens or claims of lien for work preformed or materials furnished, at the request of Purchaser, by vendors or contractors other than Seller; and

(j)    any other matters for which affirmative coverage is provided by the owner's policy of title insurance.

Seller shall discharge any mortgage or other liens now or hereafter encumbering the Unit at the Closing. Until such discharge or release is made at the Closing, Purchaser acknowledges and agrees that Purchaser's rights under this Agreement are subordinate to the lien of any construction loan or other mortgage that may encumber the Condominium Property and/or the Unit prior to the Closing.

Purchaser acknowledges that the Condominium Documents, as provided to

Purchaser contemporaneously with the execution of this Agreement, constitute the proposed documents until such time as they are approved by the Department of Business and Professional Regulation, Division of Florida Land Sales, Bureau of Standards and Registration, and Purchaser further acknowledges and agrees that Seller may modify or amend the provisions of any of the Condominium Documents, before or after the recording of any of the Condominium Document in the Public Records, to comply with requirements of governmental regulatory authorities, institutional mortgage lenders and guarantors, or title insurance companies. Purchaser specifically authorizes Seller to record in the Public Records of Miami-Dade County, Florida, prior to the Closing, all instruments required to be filed or recorded in order to legally create the Condominium pursuant to the Florida Condominium Act and other best practices.

11.    **Estate to be Conveyed**. At the Closing, Seller shall convey, by special warranty deed, fee-simple title to the Unit, together with an undivided interest in the Common Elements of the Condominium and an undivided share of the Common Surplus of the Association, which interest and share will be appurtenant to, and inseparable from, the Unit. Purchaser acknowledges that Purchaser's undivided interest in the Common Elements and undivided share of the Common Surplus may be determined solely by reference to the Declaration and the other Condominium Documents. Purchaser further acknowledges that Purchaser shall be responsible for the payment of Assessments payable to the Association to defray the Common Expenses of the Condominium and the Association. The Common Expenses will include, without limitation, the following: management and administration fees; premiums for casualty, liability and worker's compensation insurance; maintenance, repair and replacement of the Common Elements; maintenance, repair and replacement of the Association Property. Purchaser acknowledges that upon execution of this Agreement, a binding contract exists for the purchase of the Unit and for the Purchaser's assumption of the Unit's share of the Association's Assessments accruing after the Closing. Purchaser further acknowledges that Purchaser's homestead rights in the Unit under Florida law shall be subordinate to the statutory lien rights of the Association for unpaid Assessments.

12.    **Inspection of Unit**. Seller shall provide Purchaser, or Purchaser's authorized agent, with one reasonable opportunity to inspect the Unit prior to the Closing. Following Purchaser's inspection of the Unit, Purchaser shall sign an inspection statement (or "punch list") describing, with reasonable particularity, any incomplete items or defects in workmanship or materials that Purchaser discovers. Seller shall be responsible for correcting any such uncompleted items or defects in workmanship and materials (keeping in mind the construction standards prevalent in Miami-Dade County, Florida, for similar property) at Seller's cost, within a reasonable period of time after the Closing. Seller's obligation to complete items or make corrections shall not be grounds for Purchaser's delay of the Closing, nor for Purchaser's imposition of any conditions on the Closing. No "escrows" or holdbacks of closing funds shall be permitted. Seller's obligation to correct any incomplete items or listed defects in workmanship and materials shall survive the Closing.

13.    **Insulation**. Seller shall install insulation in the Unit and other portions of the Condominium Property in accordance with the following:

        (a)    Exterior building walls of the Unit shall be constructed of concrete



block, exterior stucco, and interior gypsum dry wall and plaster, and shall be insulated with batt insulation that, according to the manufacturer, will result in an R-value of R-_____; and

(b)   Interior building walls separating the Unit from other Units within the building shall be constructed of steel frame and gypsum drywall and shall be insulated with batt insulation that, according to the manufacturer, will result in an R-value of R-_____; and

(c)   The attic ceilings for all top-floor Units shall be insulated with batt insulation that, according to the manufacturer, will result in an R-value of R-_____.

14.   **Decorator-Ready Condition**.  Seller shall deliver the Unit to Purchaser in a "decorator ready" condition at the Closing, including fixtures, base-painted drywall, and bathroom floor coverings.  Seller shall not install floor coverings elsewhere within the Unit, nor provide other finishes or furnishings, except as otherwise specifically disclosed and described in writing.

15.   **Warranties & Disclaimer**.  Purchaser shall have the benefit of the statutory warranties provided in Section 718.203, Fla. Stat. (2005).  Seller hereby warrants that the Unit has never been occupied and is being sold as a newly constructed residence.  Seller provides no additional warranties whatsoever, and Purchaser hereby waives and disclaims all rights and remedies that Purchaser may have under any such additional common-law, implied or statutory warranties.

16.   **Building Changes**.  Seller hereby reserves the right to make architectural, structural, or design modifications in the Unit, or in the improvements constituting the recreational facilities and other Common Elements of the Condominium, as Seller deems necessary or desirable, or in the materials, equipment, and appliances contained in the Unit or the Common Elements.  Purchaser agrees to consummate the Closing notwithstanding any such modifications or substitutions, provided that no such modification or substitution materially alters the dimensions, size, or value of the Unit or the Common Elements.  Seller agrees that any substituted materials, equipment, or appliances shall be of equivalent or better quality, and no such modification or substitution shall result in an increase in the Purchase Price.

17.   **No Recording of Agreement**.  Purchaser covenants and agrees that it shall not record, nor permit any other person to record on Purchaser's behalf, this Agreement or a notice of *lis pendens* based upon this Agreement, in the Public Records, and acknowledges that the execution of this Agreement does not create any lien, claim of lien or other interest against or in the Unit in favor of Purchaser.  Purchaser hereby waives and releases any such lien, lien rights or the right to file or record a notice of *lis pendens*.  In the event that Purchaser, or any other person acting on Purchaser's behalf, so records this Agreement or a notice of *lis pendens* based upon this Agreement, such act will be deemed to be a material default under this Agreement, and Purchaser further covenants and agrees to pay, in addition to the liquidated damages described in Section 18, the reasonable attorneys' fees and costs actually incurred by Seller to clear title to the Unit.

18.     **Purchaser's Default**.  In the event that Purchaser fails to make any of the payments scheduled in this Agreement, or fails or refuses to execute the instruments required to consummate the Closing (including failure to promptly execute and file all mortgage loan application documents, all mortgage loan and real estate closing documents, and to comply with requirements of the mortgage lender, including providing any and all information as requested), or refuses to pay any costs or sums required by this Agreement, or Purchaser otherwise defaults in the performance of Purchaser's obligations under this Agreement, and fails to correct such default within five (5) days after Seller has given Purchaser written notice of such default, then Seller may declare this Agreement terminated and retain all Escrow Deposit funds, together with all interest accrued thereon, and payments for Upgrades paid by Purchaser, as liquidated and agreed-upon damages that Seller will have sustained and suffered as a result of Purchaser's default.  In the event of Purchaser's default and forfeiture of Escrow Deposit funds, Seller and Purchaser shall be released from all further obligations under this Agreement.  The provisions set forth in this Section 18 for liquidated and agreed-upon damages are intended as a pre-default estimate of Seller's actual damages and are not intended as a penalty, and Purchaser understands and acknowledges that by reason of the withdrawal of the Unit from sale to the general public, at times when other potential purchasers would be interested in buying the Unit, that Seller will have sustained real economic damages if Purchaser defaults, which damages will be substantial but will not be capable of determination with mathematical precision and, therefore, the provision for liquidated and agreed-upon damages has been incorporated into this Agreement as a provision beneficial to both parties.

19.     **Seller's Default**.  In the event that Seller defaults in the performance of its obligations under this Agreement, Purchaser shall be entitled to the return of its Escrow Deposit, together with any interest accrued thereon, and, thereafter Purchaser may seek all other remedies available at law or in equity.

20.     **Multiple Purchasers**.  If two or more persons are collectively named as Purchaser herein, any one of them is hereby authorized to act as the agent for all others, with the power to legally bind the others in all matters related to this Agreement.  If Purchaser is married, and Purchaser's spouse is not named as one of the persons constituting Purchaser in this Agreement, Purchaser shall be responsible and liable for such spouse executing the mortgage and other closing documents as required by Purchaser's lender.  Failure of Purchaser's spouse to do so shall constitute a material default by Purchaser under this Agreement.

21.     **Notices**.  Notices to either party shall be properly given when transmitted in writing by: (a) certified U.S. mail, return receipt requested, with sufficient postage affixed; (b) nationally-recognized overnight courier service; or (c) personal delivery (including same-day courier service).  Unless otherwise provided in this Agreement, notice shall be deemed to have been given on the third (3rd) business day following deposit with the U.S. Postal Service if transmitted by certified U.S. mail, or on the date of actual delivery if transmitted by overnight courier service or personal delivery.  Notice to one person acting as agent or one of several persons constituting Purchaser shall be deemed to be valid notice to all others.  Notices shall be addressed as follows:

For Seller:                    Royal Palm Miami Holdings, LLC
c/o Royal Palm Communities
1499 West Palmetto Park Road, Suite 200
Boca Raton, FL 33486-3321
Attention: Controller

With a copy to:            Terra Title Corporation
701 West Cypress Creek Road, Suite 303
Fort Lauderdale, FL 33309-2045
Attention: Steven A. Amster, Esq.

For Purchaser:           At Purchaser's address shown on the first page of this Agreement.

Any party may designate a different address for purpose of notices by providing written notice to the other parties in the same manner provided above.

22. **Access to Unit**. Except as provided in Section 12, Purchaser shall not have access or entry to the Unit, nor shall Purchaser store any of Purchaser's possessions in or about the Unit or the Condominium Property before the Closing. Purchaser shall not interfere with workmen during working hours, nor enter upon the job site, and all matters pertaining to the construction of the Unit shall be presented by Purchaser directly to Seller's authorized sales agent and its representatives.

23. **Seller's Use of Property**. Seller hereby reserves the right to use the Condominium Property and the Common Elements thereof for the promotion of sales or leases of other units within the Condominium which are owned by Seller and its successors and assigns. Seller's promotional uses may include, without limitation, the maintenance of a sales office, the maintenance of model units, the display of promotional signs, and the showing of unsold Units to prospective purchasers. If other units owned by Seller remain unsold at the time of the Closing, Seller may lease such unsold Units to tenants selected by Seller, and Seller may subsequently sell such units to purchasers acceptable to Seller.

24. **Radon Gas Disclosure**. As required by Section 404.056(8), Fla. Stat. (2005), Seller hereby provides Purchaser with notice that "radon is a naturally occurring radioactive gas that when it has accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time. Levels of radon that exceed Federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health unit."

25. **Risk of Loss**. Seller shall bear the risk of loss until the Closing is consummated.

26. **Assignment by Purchaser**. Purchaser may not assign all or any portion of its right, title or interest in this Agreement, without the express written consent of Seller, which consent may be withheld in Seller's sole discretion. Notwithstanding the foregoing, Purchaser may freely assign its entire interest in this Agreement to a qualified

intermediary pursuant to the terms of a written like-kind exchange agreement in accordance with 26 U.S.C. § 1031 and the U.S. Treasury Regulations promulgated thereunder, and Seller agrees to cooperate in such exchange provided that there is no delay in the Closing date and there is no additional expense to Seller.

If Purchaser is a corporation, limited liability company, partnership or other form of business entity, neither Purchaser nor its equity owners may sell, transfer or assign any of the equity ownership interests in Purchaser before the Closing without the express written consent of Seller in accordance with this Section 26.

27. **Resale of Unit.** Purchaser may not resell the Unit or to enter into an agreement to resell the Unit before the Closing. Any attempt by Purchaser to resell the Unit or to enter into an agreement to resell the Unit before the Closing shall be deemed to be null and void, and this provision shall be deemed to be a covenant for the benefit of Seller and Seller shall be entitled to enforce such covenant by specific performance.

28. **Binding Agreement.** This Agreement shall be binding upon, and shall inure to the benefit of, Seller and Purchaser's respective heirs, personal representatives, successors and permitted assigns, as applicable.

29. **Entire Agreement.** Seller and Purchaser agree that all prior conversations, negotiations, understandings and agreements are superseded by this Agreement. No representations, claims, state-ments, inducements, advertising, brochures, promotional activities, maps or other materials, given by Seller or Seller's agents shall be of any force and effect unless expressly set forth in this Agreement or in the Condominium Documents. The provisions of this Section 29 shall survive the Closing or the earlier termination of this Agreement. Upon the consummation of the Closing, Purchaser's acceptance of a special warranty deed shall be deemed to be acknowledgment of Seller's full performance of its obligations under this Agreement, and further deemed to be a discharge of every agreement, obligation, and representation made by Seller or Seller's agents, in accordance with the terms and conditions of this Agreement. No prior agreement or representation shall survive the delivery and acceptance of the deed, except as expressly set forth in this Agreement, or in writing at or before the Closing.

30. **Addendum.** An Addendum signed by Seller and Purchaser and attached to this Agreement may set forth certain Upgrades to be included in the Unit, or other special modifications of this Agreement requested by Purchaser. An Addendum, if signed and attached, is incorporated herein by this reference. Seller shall have no obligation to provide any Upgrade unless such Upgrade is specified in a written Addendum attached hereto.

31. **Amendments.** No amendment of this Agreement shall be binding unless it is in writing and signed by the parties. Attempted oral amendments shall be void and without effect.

32. **Choice of Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida.

33. **Choice of Venue.** In the event that either Seller or Purchaser initiates

litigation arising from this Agreement, the relationship of the parties hereunder, or the subject matter hereof, the only proper venue shall be in the Circuit Court in and for Miami-Dade County, Florida.

34.   **Attorneys' Fees.**  If either Purchaser or Seller files suit to enforce their rights under this Agreement, the non-prevailing party shall pay all reasonable attorneys' fees and costs, including those related to any appeal or bankruptcy, incurred by the prevailing party. Seller shall also be entitled to collect all attorneys' fees actually incurred before the Closing to enforce the terms and conditions of this Agreement.

35.   **Severability.**  If a court of competent jurisdiction, as identified in Section 33 above, determines that any provision of this Agreement is unenforceable, the unenforceability of such provision shall not affect the validity or enforceability of any other provision of the Agreement.

36.   **Captions & Headings.**  The captions and headings at the beginning of each section or paragraph of this Agreement are intended solely for convenience of reference, and are not intended to limit, interpret or otherwise construe the text of this Agreement.

37.   **Consideration for Agreement.**  Purchaser acknowledges and agrees that the primary inducement to purchase and consideration for the Unit under this Agreement is the Unit itself.

38.   **Dates for Performance.**  If the date for the performance of any action under this Agreement shall fall on a Saturday, Sunday or legal holiday, such action shall, and may, be performed before 5:00 p.m. on the next succeeding business day that is not a Saturday, Sunday or legal holiday. The term "day" as used and described in this Agreement shall refer to calendar days, unless otherwise specifically provided.

39.   **Time is of the Essence.**  Time is of the essence in Purchaser's performance of Purchaser's respective obligations under this Agreement.

40.   **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all such counterparts together shall constitute one and the same instrument.

41.   **Effective Date.**  The Effective Date of this Agreement shall be the date that Seller executes this Agreement and delivers a signed counterpart hereof to Purchaser, as shown by the date set forth adjacent to Seller's signature below.

42.   **Real Estate Brokers.**  Each of Seller and Purchaser warrants and represents to the other that no real estate broker or agent is involved in this purchase and sale, other than Majestic Properties Miami, Inc. ("**Seller's Broker**"), and
_____ ("**Cooperating Broker**"), and each of Seller and Purchaser further agrees to indemnify and hold the other harmless against all claims of other real estate brokers or agents arising from the acts or omissions of the indemnifying party or its authorized agents. Seller shall pay any commission collectively due Seller's Broker and Cooperating Broker; provided, however,

that the commission paid to Cooperating Broker shall not exceed four percent (4.00%) of the Purchase Price.

43. **Construction Industries Recovery Fund**. Pursuant to Section 489.1425, Fla. Stat. (2005), Seller provides Purchaser with the following notice: Payment may be available from the Construction Industries Recovery Fund if you lose money on a project performed under contract, where the loss results from specified violations of Florida law by a state-licensed contractor. For information about the recovery fund and filing a claim, contact the Florida Construction Industry Licensing Board at the following telephone number and address (850) 487-1395, CILB Recovery Fund, 1940 North Monroe Street, Suite 60, Tallahassee, Florida 32399-2292.

44. **Remedies Regarding Construction Defects**. In accordance with Florida law, Seller provides Purchaser with the following notice: Florida law contains important requirements you must follow before you may file a lawsuit for defective construction against a contractor, subcontractor, supplier, or design professional for an alleged construction defect in your home. Sixty days before you file your lawsuit, you must deliver to the contractor, subcontractor, supplier, or design professional a written notice of any construction conditions you allege are defective and provide your contractor and any subcontractors, suppliers, or design professionals the opportunity to inspect the alleged construction defects and make an offer to repair or pay for the alleged construction defects. You are not obligated to accept any offer made by the contractor or any subcontractors, suppliers, or design professionals. There are strict deadlines and procedures under Florida law.

If Purchaser rejects any settlement offer made pursuant to such Florida law by Seller or other contractors, subcontractors, suppliers or design professionals hired by, through or under Seller or its affiliates (collectively, **"Protected Parties"**), and Purchaser elects to proceed with an action against one or more Protected Parties, Purchaser acknowledges that all provisions of this Agreement respecting such disputes remain in full force and effect.

45. **Receipt of Condominium Documents**. By initialing this Section 41, Purchaser acknow-ledges Purchaser's receipt of the Prospectus, the Declaration of Condominium, the Articles of Incorporation, the Bylaws, the Rules & Regulations and the other Condominium Documents required by Section 718.503, Fla. Stat. (2005), to be delivered to Purchaser by Seller.

Purchaser's initials: _____    Purchaser's initials: _____

**This Agreement is voidable by Purchaser by delivering written notice of Purchaser's intention to cancel within fifteen (15) days after the date of execution of this Agreement by Purchaser, and receipt by Purchaser of all of the items required to be delivered to Purchaser by Seller under Section 718.503, Florida Statutes. This Agreement is also voidable by Purchaser by delivering written notice of Purchaser's intention to cancel within fifteen (15) days after the date of receipt from Seller of any amendment which materially alters or modifies the offering in a manner that is adverse to Purchaser. Any purported waiver of these voidability rights shall be of no effect. Purchaser may extend the time for the Closing for a period of not more**

than fifteen (15) days after Purchaser has received all of the items required. Purchaser's right to void this Agreement shall terminate at the Closing.

Oral representations cannot be relied upon as correctly stating the representations of Seller.  For correct representations, reference should be made to this Agreement and the documents required by Section 718.503, Florida Statutes, to be furnished by Seller to Purchaser or a lessee.

Any payment in excess of 10 percent of the Purchase Price made to Seller prior to the Closing pursuant to this Agreement may be used for construction purposes by Seller.

Purchaser has the option to cancel this Agreement by notice to Seller until midnight of the fifteenth (15th) day following the signing of this Agreement.

In Witness Whereof, each of Purchaser and Seller has executed, or has caused their respective duly authorized representative to execute, this Agreement as of the dates set forth below.

Purchaser:

Signature:_____

Printed name:_____

Social Security Number:_7 1 0 3 6 0 8 2 0

Date:_____5/9/05_____

Purchaser:

Signature:_____

Printed name:_____

Social Security Number:_____

Date:_____

*[Signatures continued on the following page of this Agreement.]*

*[Signatures continued from the preceding page of this Agreement.]*

**Seller**:
Royal Palm Miami Holdings, LLC,
a Florida limited liability company

By:_____

Printed name:_____

Date:_____


**Cooperating Broker**:

By:_____

Printed name:_____

Date:_____

*I have completed the information required by Section 42 above.*

MIAMI, FL  33143

Date 5/9/06

63-460/660
01

Pay to the
Order of _TERRA Title Cerg_    $ 94000 ⁰⁵

_Ninety four Thousand_    Dollars

**Coconut Grove Bank**
Main Office
2701 South Bayshore Drive
Coconut Grove, Florida 33133

For _____

⑈066004600⑈ 0⑈1468651⑈06 458 2

EXHIBIT "B"

PARAMOUNT BAY, A CONDOMINIUM
CONDOMINIUM UNIT PURCHASE & SALE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLA. STAT. (2005), TO BE FURNISHED BY SELLER TO PURCHASER OR A LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO SELLER PRIOR TO THE CLOSING PURSUANT TO THIS AGREEMENT MAY BE USED FOR CONSTRUCTION PURPOSES BY SELLER.

THIS CONDOMINIUM UNIT PURCHASE & SALE AGREEMENT (this "**Agreement**"), dated to effective as of the Effective Date, is made by and between ROYAL PALM MIAMI HOLDINGS, LLC, a Florida limited liability company whose address is 1499 West Palmetto Park Road, Suite 200, Boca Raton, Florida 33486-3321 ("**Seller**"), and

Purchaser's name:  **Alfred Damus**  aND LEAtrice Damus

Purchaser's local address: 8145 SW 53rd Avenue Miami, FL 33143

Purchaser's permanent address:

Purchaser's Social Security Number: 710-56 0520 AD
LEAtrice DAmus  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
Purchaser's local telephone:  305-667-7671

Purchaser's permanent telephone: 305-667-7671

Exact name(s) in which title will be taken:  SAme As Above

hereinafter called "**Purchaser**."

NOW, THEREFORE, in consideration of the mutual promises set forth in this Agreement, and other good and valuable consideration, Purchaser and Seller agree as follows:

1.    **Unit to be Sold**.  Seller agrees to sell and convey to Purchaser that certain condominium parcel described as Unit **1705** Paramount Bay, A Condominium (the "**Unit**"), together with an undivided share in the Common Elements and other appurtenances to the Unit as described in the Declaration of Condominium for Paramount Bay, A Condominium (the "**Declaration**"), the Prospectus, and related condominium association documents to be recorded in the Public Records of Miami-Dade County, Florida (collectively, the "**Condominium Documents**").  Purchaser agrees to purchase and

Purchaser's initials:

accept the Unit on the terms and conditions set forth in this Agreement, and subject to all of the provisions of the Declaration and the other Condominium Documents.  The sale of the Unit shall include the assignment of the exclusive right to use one automobile parking space, which parking space shall constitute a portion of the Limited Common Elements as further described in the Declaration; Purchaser may purchase the exclusive right to use one or more additional parking spaces, to the extent such spaces are available.

2.  **Purchase Price**.  The total consideration to be paid by Purchaser to Seller for the Unit (the "**Purchase Price**") shall be determined as follows:

|     |     |     |
| --- | --- | --- |
| (a) | Unit Base Price: | **$940,000** |
| (b) | Additional Upgrades enumerated in **Exhibit A** and incorporated herein: | $ |
| (c) | **PURCHASE PRICE:** | $**940,000** |

The Purchase Price shall be subject to the prorations, offsets and other fees specified in Section 10 and elsewhere in this Agreement.

3.  **Payment Terms**.  Purchaser shall pay the Purchase Price in accordance with the following payment schedule:

|     |     |     |
| --- | --- | --- |
| (a) | Initial partial payment of Escrow Deposit, due upon execution and delivery of this Agreement (first 10 percent of the Purchase Price): | $ **94,000** |
| (b) | Balance of Escrow Deposit, due on or before the seventh (7th) day after receipt of notice that construction has begun (second 10 percent of the Purchase Price): | $ **94,000** |
|     | electronic funds transfer, due at the Closing: | $ **752,000** |
| (d) | **TOTAL PAYMENTS:** | $ **940,000** |

The combined payments described in and required by paragraphs 3(a) and (b) shall be held as security for the performance of Purchaser's obligations pursuant to the terms and conditions of this Agreement (the "**Escrow Deposit**").  The balance of the Purchase Price due at the Closing, as described in and required by paragraph 3(c), shall be subject to adjustment for prorations and expenses as described elsewhere in this Agreement.  Purchaser shall make all payments due under this Agreement in immediately available funds, payable in U.S. currency.

4.  **Upgrades**.  Seller must acknowledge and agree to all upgrades, if any, requested by

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials:

4.     **Upgrades**.  Seller must acknowledge and agree to all upgrades, if any, requested by Purchaser pursuant to an addendum attached to this Agreement as **Exhibit A** (the "**Upgrades**").  The cost of each of the Upgrades shall be determined by the published Schedule of Upgrade List Prices, as prepared by Seller.  If Seller omits any of the Upgrades requested by Purchaser, Seller shall only refund to Purchaser the amount that Purchaser paid to Seller for each of the Upgrades so omitted.  Except for such omissions, Purchaser's payment for any of the Upgrades shall not be refundable, even if this Agreement is otherwise terminated in accordance with its terms by Purchaser.

5.     **Escrow Deposit**.  The Escrow Deposit shall constitute twenty percent (20.00%) of the Purchase Price, payable as described in this Section 5.  Purchaser shall deliver the first Escrow Deposit payment, constituting ten percent (10.00%) of the Purchase Price to Seller, together with a counterpart of this Agreement fully executed by Purchaser.  Purchaser shall deliver the second Escrow Deposit payment, constituting an additional ten percent (10.00%) of the Purchase Price, to Seller on or before the seventh (7th) day after receipt of notice that construction of the Paramount Bay project has begun; thereafter, Escrow Agent may release all Escrow Deposit funds in excess of ten percent (10.00%) of the Purchase Price to Seller, which Seller may use for construction purposes.  The balance of the Escrow Deposit funds shall be held until the Closing, or the earlier termination of this Agreement, by Terra Title Corporation, 701 West Cypress Creek Road, Suite 303, Fort Lauderdale, Florida 33309-2045, Attention: Steven R. Amster, Esq. ("**Escrow Agent**").  Escrow Agent shall place the undisbursed Escrow Deposit funds in an interest-bearing account at a depository institution insured by the Federal Deposit Insurance Corporation and located in either Broward or Miami-Dade County, Florida.  Thereafter, Escrow Agent shall hold and disburse the Escrow Deposit funds pursuant to the terms and conditions of this Agreement, as well as pursuant to the terms and conditions of the Escrow Agreement by and between Seller and Escrow Agent (the "**Escrow Agreement**").  By Purchaser's execution of this Agreement, Purchaser covenants and agrees to be bound by and to abide by the terms and conditions of the Escrow Agreement.  Purchaser may, upon request, obtain a receipt from Escrow Agent for the Escrow Deposit.  Subject to the terms and conditions of the Escrow Agreement, Escrow Agent shall hold and disburse the Escrow Deposit in accordance with the following:

(a)     If Purchaser properly terminates this Agreement in accordance with its terms and conditions, Escrow Agent shall disburse all Escrow Deposit funds to Purchaser.

(b)     If Purchaser defaults in the performance of its obligations under this Agreement, Escrow Agent shall disburse all Escrow Deposit funds to Seller.

(c)     If the Closing of the purchase-and-sale transaction contemplated by this Agreement is consummated, Escrow Agent shall disburse all Escrow Deposit funds for application against the Purchase Price.

6.     **Cash Transaction**.  Purchaser shall deliver the balance of the Purchase Price in immediately available funds at the Closing, by cashier's check drawn on a Broward or Miami-Dade County institution or by electronic funds ("wire") transfer; Purchaser acknowledges and agrees that neither an official check nor a personal check is an acceptable alternative means of payment.  Purchaser's obligation to purchase the Unit shall not be contingent or conditioned upon Purchaser's obtaining financing.

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials:

7.     **Amendment of Condominium Documents**.  Seller reserves the right to make such changes in any of the Condominium Documents as governmental regulatory authorities, title insurance companies, or mortgage lenders may require, provided that such changes do not: materially alter the configuration, size, or boundaries of the Unit; materially alter the appurtenances to the Unit; change Purchaser's undivided interest in the Common Elements and the Common Surplus, or Purchaser's share of the Common Expenses; or otherwise materially alter the rights of Purchaser or the value of the Unit. Seller shall send written notice to Purchaser of all changes or amendments.

8.     **Plans & Construction**.  Seller agrees to construct the Unit in substantial and material conformity with the plans and specifications on file in Seller's office, which Purchaser may inspect upon reasonable notice.  Purchaser acknowledges that Seller has made available the plans and specifications for the Unit and the Condominium for inspection by Purchaser.  Purchaser acknowledges that the Unit may be the reverse or mirror image of the floor plan of any model shown in Seller's sales brochures or other promotional materials.  Purchaser acknowledges that the dimensions shown in Seller's plans, and in any sales or promotional materials are approximate and may change due to field conditions. Purchaser acknowledges that any existing model Unit may contain items or special features which are not included in Purchaser's Unit, such as furnishings and decorations, accessories, special window treatments, upgraded carpeting and flooring, special wall treatments, upgraded fixtures and special lighting effects, and extra appliances.  Purchaser understands and acknowledges that the Purchase Price only includes the construction of Purchaser's Unit pursuant to Seller's plans and specifications, standard items specified in Purchaser's sales brochures, and any Upgrades ordered by Purchaser and enumerated in an Addendum attached to this Agreement.  Seller shall have complete discretion in "finishing details," including, without limitation, the exterior of the buildings, landscaping, amenities, and beautification of the Condominium.

9.     **Closing**.  If the Effective Date of this Agreement occurs before or during construction of the Unit, the parties shall consummate the Closing no later than ten (10) days after Seller's transmittal to Purchaser of notice that a certificate of occupancy has been issued for the Unit.  The issuance of a conditional, temporary, partial or final certificate of occupancy shall be deemed to be conclusive evidence that the Unit is substantially complete, and, thereafter, time shall be of the essence regarding the performance of the parties' respective obligations under this Agreement.  In all events, Seller shall substantially complete the Unit within three years after the Effective Date.  If a certificate of occupancy has been issued for the Unit on or before the Effective Date, the parties shall consummate the Closing on or before the forty-fifth (45th) day after the Effective Date.  If Purchaser fails to close in accordance with the requirements of this Section 9, this Agreement shall become null and void, and at the option of Seller, Purchaser shall forfeit all Escrow Deposit funds and Upgrade fees previously paid in accordance with Sections 3, 4 and 5.  The Closing shall be consummated in accordance with the following:

(a)     The Closing shall be held at the Condominium sales office located at 2066 North Bayshore Drive, Miami, Florida 33137-5124, or at such other Miami-Dade County, Florida location as Seller may designate.  Seller shall inform Purchaser of the designated date of the Closing in a written "notice of closing" sent to Purchaser at least ten (10) days prior to the scheduled date of the Closing.  The notice of closing shall be effective on the third (3rd) business day after its mailing, and an affidavit of Seller's employee or agent that such notice was mailed shall be conclusive evidence of its mailing.  If Purchaser causes any delay beyond the scheduled date of the Closing, as determined by this paragraph 9(a), Purchaser shall pay interest at the

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials: _____

annual rate of eighteen percent (18.00%) on the Purchase Price for the period of such delay, in addition to the Purchase Price. Notwithstanding Purchaser's payment of interest as described in the preceding sentence, Seller may declare Purchaser to be in default at any time after the scheduled date of the Closing, pursuant to Section 18, if Purchaser fails to consummate the Closing for any reason.

(b)     Purchaser shall pay the balance of the Purchase Price in immediately available funds as described in Section 6.

(c)     Seller shall convey fee-simple title to the Unit by means of a special warranty deed, subject only to the title exceptions identified in Section 10 below and other matters for which Seller shall obtain affirmative title insurance coverage. Seller shall assign the exclusive right to use at least one automobile parking space by means of an assignment of limited common elements (subject to availability, Purchaser may purchase the exclusive right to use one or more additional parking spaces). At the Closing, Seller shall provide Purchaser with a settlement statement (Form HUD-1) and a standard form of "Seller's Affidavit" that shall include a statement that Seller is not a "foreign" person as such term is defined in 26 U.S.C. § 1445, and the Treasury Regulations promulgated thereunder.

(d)     *Ad valorem* real property taxes and assessment installments for the year of the Closing shall be prorated between Purchaser and Seller as of 12:01 a.m. on the date of the Closing, and the respective credit or debit to each of Seller and Purchaser shall be shown on the Settlement Statement.

(e)     Seller shall provide the special warranty deed, the other closing documents, and the owner's policy of title insurance. Seller shall pay for the preparation of the deed, the other closing documents and the title policy, the title examination costs and the premium attributable to such policy, as well as Seller's own attorneys' fees and costs.

(f)     In addition to the Purchase Price, Purchaser shall pay one and one-half percent (1.50%) of the Purchase Price as a "**Closing Fee**" to Seller to offset various administrative costs and expenses of marketing and development, and to cover the costs and expenses of the Closing, including, without limitation, the preparation of the special warranty deed and other closing documents; the recording fees and documentary stamp tax due upon the recording of the special warranty deed; the premium for the owner's policy of title insurance; and other organizational costs.

(g)     Purchaser shall pay all costs of obtaining a mortgage loan, including the documentary stamp tax and intangible tax due on such note or mortgage, the premiums for a mortgagee's policy of title insurance and related endorsements, an additional $500.00 loan closing fee payable to Escrow Agent, and the attorneys' fees and costs of Purchaser and Purchaser's lender, if any. If Purchaser is unable to physically attend the Closing, Purchaser shall pay all additional courier fees and telecopier charges that Seller or Escrow Agent incurs as a consequence.

(h)     If Purchaser intends to acquire the Unit with the assistance of a federally-

Purchaser's initials:

guaranteed mortgage loan, Purchaser may purchase an owner's policy of title insurance from any title company of Purchaser's choosing. Pursuant to paragraphs 9(e) and (f), Seller agrees to pay for and furnish an owner's policy of title insurance through Escrow Agent, acting as the title agent for Attorneys Title Insurance Fund, Inc. or Commonwealth Land Title Insurance Company. If Purchaser elects to obtain title insurance through a title agent other than Escrow Agent, the Closing Fee shall be reduced by the minimum promulgated rate for issuing an owner's policy of title insurance for the Unit. However, in such case, Purchaser shall be responsible for paying Seller an additional closing fee of Four Hundred U.S. Dollars ($400.00) to partially reimburse Seller and Escrow Agent for the additional costs, expenses and fees that they will incur to coordinate and close the sale of the Unit through a third-party title and closing agent. If Purchaser chooses this option, Purchaser must notify Seller in writing, at the time Purchaser executes and delivers this Agreement to Seller or within fifteen (15) days thereafter, of the name and address of the title agent that Purchaser has selected and acknowledging Purchaser's obligation under this Agreement to pay the $400 additional closing fee. If such written notice is not transmitted to Seller in accordance with the preceding sentence, Purchaser shall be deemed: (i) to have selected Escrow Agent as the title agent through which title insurance shall be issued; and (ii) to have agreed to pay the full Closing Fee to Seller, in which case Seller shall be responsible for paying the premium for an owner's policy of title insurance in the face amount of the Purchase Price pursuant to paragraph 9(e).

Purchaser's initials: _____   Purchaser's initials: _____

(i)      Purchaser shall pay a prorated share of the current calendar month's Assessment installment and one additional month's Assessment installment in advance. In addition to all other amounts payable under this Agreement, Purchaser shall also make a contribution to the working capital of the Association equal to three times the monthly Assessment installment due from the owner of the Unit; this working capital contribution shall not be credited against Purchaser's obligation to pay future Assessment installments.

10.      **Title.** Seller shall provide a title insurance commitment to Purchaser at least seven (7) days before the Closing, showing that Seller has good and marketable fee-simple title to the Unit, insurable by a nationally recognized title insurer at its promulgated rates, subject only to the following title exceptions:

(a)      real estate *ad valorem* taxes and assessment installments for the year of the Closing and subsequent years;

(b)      easements existing and to be created for ingress and egress to and from the Condominium Property, and for utility service lines, parking and other purposes;

(c)      conditions, restrictions, limitations and mineral rights of record;

(d)      zoning and land use regulations applicable to the Condominium Property;

(e)      the covenants, conditions, restrictions and easements set forth in the Declaration, including without limitation, the covenant to pay Assessments;

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials: _____

(f)      the provisions of the Condominium Documents, including without limitation, the Articles of Incorporation, the Bylaws and the Rules & Regulations;

(g)      the standard Florida form exceptions for any adverse ownership claim by the State of Florida by right of sovereignty, including submerged, filled and artificially exposed lands;

(h)      the mortgage, if any, executed by Purchaser in favor of a mortgage lender to finance Purchaser's acquisition of the Unit;

(i)      construction liens or claims of lien for work preformed or materials furnished, at the request of Purchaser, by vendors or contractors other than Seller; and

(j)      any other matters for which affirmative coverage is provided by the owner's policy of title insurance.

Seller shall discharge any mortgage or other liens now or hereafter encumbering the Unit at the Closing. Until such discharge or release is made at the Closing, Purchaser acknowledges and agrees that Purchaser's rights under this Agreement are subordinate to the lien of any construction loan or other mortgage that may encumber the Condominium Property and/or the Unit prior to the Closing.

Purchaser acknowledges that the Condominium Documents, as provided to Purchaser contemporaneously with the execution of this Agreement, constitute the proposed documents until such time as they are approved by the Department of Business and Professional Regulation, Division of Florida Land Sales, Bureau of Standards and Registration, and Purchaser further acknowledges and agrees that Seller may modify or amend the provisions of any of the Condominium Documents, before or after the recording of any of the Condominium Document in the Public Records, to comply with requirements of governmental regulatory authorities, institutional mortgage lenders and guarantors, or title insurance companies. Purchaser specifically authorizes Seller to record in the Public Records of Miami-Dade County, Florida, prior to the Closing, all instruments required to be filed or recorded in order to legally create the Condominium pursuant to the Florida Condominium Act and other best practices.

11.      **Estate to be Conveyed**. At the Closing, Seller shall convey, by special warranty deed, fee-simple title to the Unit, together with an undivided interest in the Common Elements of the Condominium and an undivided share of the Common Surplus of the Association, which interest and share will be appurtenant to, and inseparable from, the Unit. Purchaser acknowledges that Purchaser's undivided interest in the Common Elements and undivided share of the Common Surplus may be determined solely by reference to the Declaration and the other Condominium Documents. Purchaser further acknowledges that Purchaser shall be responsible for the payment of Assessments payable to the Association to defray the Common Expenses of the Condominium and the Association. The Common Expenses will include, without limitation, the following: management and administration fees; premiums for casualty, liability and worker's compensation insurance; maintenance, repair and replacement of the Common Elements; maintenance, repair and replacement of the Association Property. Purchaser acknowledges that upon execution of this Agreement, a binding contract exists for the purchase of the Unit and for the Purchaser's assumption of the Unit's share of the Association's

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials:

Assessments accruing after the Closing. Purchaser further acknowledges that Purchaser's homestead rights in the Unit under Florida law shall be subordinate to the statutory lien rights of the Association for unpaid Assessments.

12. **Inspection of Unit**. Seller shall provide Purchaser, or Purchaser's authorized agent, with one reasonable opportunity to inspect the Unit prior to the Closing. Following Purchaser's inspection of the Unit, Purchaser shall sign an inspection statement (or "punch list") describing, with reasonable particularity, any incomplete items or defects in workmanship or materials that Purchaser discovers. Seller shall be responsible for correcting any such uncompleted items or defects in workmanship and materials (keeping in mind the construction standards prevalent in Miami-Dade County, Florida, for similar property) at Seller's cost, within a reasonable period of time after the Closing. Seller's obligation to complete items or make corrections shall not be grounds for Purchaser's delay of the Closing, nor for Purchaser's imposition of any conditions on the Closing. No "escrows" or holdbacks of closing funds shall be permitted. Seller's obligation to correct any incomplete items or listed defects in workmanship and materials shall survive the Closing.

13. **Insulation**. Seller shall install insulation in the Unit and other portions of the Condominium Property in accordance with the following:

(a) Exterior building walls of the Unit shall be constructed of concrete block, exterior stucco, and interior gypsum dry wall and plaster, and shall be insulated with batt insulation that, according to the manufacturer, will result in an R-value of R-_____; and

(b) Interior building walls separating the Unit from other Units within the building shall be constructed of steel frame and gypsum drywall and shall be insulated with batt insulation that, according to the manufacturer, will result in an R-value of R-_____; and

(c) The attic ceilings for all top-floor Units shall be insulated with batt insulation that, according to the manufacturer, will result in an R-value of R-_____.

14. **Decorator-Ready Condition**. Seller shall deliver the Unit to Purchaser in a "decorator ready" condition at the Closing, including fixtures, base-painted drywall, and bathroom floor coverings. Seller shall not install floor coverings elsewhere within the Unit, nor provide other finishes or furnishings, except as otherwise specifically disclosed and described in writing.

15. **Warranties & Disclaimer**. Purchaser shall have the benefit of the statutory warranties provided in Section 718.203, FLA. STAT. (2005). Seller hereby warrants that the Unit has never been occupied and is being sold as a newly constructed residence. Seller provides no additional warranties whatsoever, and Purchaser hereby waives and disclaims all rights and remedies that Purchaser may have under any such additional common-law, implied or statutory warranties.

16. **Building Changes**. Seller hereby reserves the right to make architectural, structural, or design modifications in the Unit, or in the improvements constituting the recreational facilities and other Common Elements of the Condominium, as Seller deems necessary or desirable, or in the materials, equipment, and appliances contained in the Unit or the Common Elements. Purchaser agrees to consummate the Closing notwithstanding any such modifications or substitutions, provided that no such

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Page 8

Purchaser's initials:_____

modification or substitution materially alters the dimensions, size, or value of the Unit or the Common Elements. Seller agrees that any substituted materials, equipment, or appliances shall be of equivalent or better quality, and no such modification or substitution shall result in an increase in the Purchase Price.

17. **No Recording of Agreement**. Purchaser covenants and agrees that it shall not record, nor permit any other person to record on Purchaser's behalf, this Agreement or a notice of *lis pendens* based upon this Agreement, in the Public Records, and acknowledges that the execution of this Agreement does not create any lien, claim of lien or other interest against or in the Unit in favor of Purchaser. Purchaser hereby waives and releases any such lien, lien rights or the right to file or record a notice of *lis pendens*. In the event that Purchaser, or any other person acting on Purchaser's behalf, so records this Agreement or a notice of *lis pendens* based upon this Agreement, such act will be deemed to be a material default under this Agreement, and Purchaser further covenants and agrees to pay, in addition to the liquidated damages described in Section 18, the reasonable attorneys' fees and costs actually incurred by Seller to clear title to the Unit.

18. **Purchaser's Default**. In the event that Purchaser fails to make any of the payments scheduled in this Agreement, or fails or refuses to execute the instruments required to consummate the Closing (including failure to promptly execute and file all mortgage loan application documents, all mortgage loan and real estate closing documents, and to comply with requirements of the mortgage lender, including providing any and all information as requested), or refuses to pay any costs or sums required by this Agreement, or Purchaser otherwise defaults in the performance of Purchaser's obligations under this Agreement, and fails to correct such default within five (5) days after Seller has given Purchaser written notice of such default, then Seller may declare this Agreement terminated and retain all Escrow Deposit funds, together with all interest accrued thereon, and payments for Upgrades paid by Purchaser, as liquidated and agreed-upon damages that Seller will have sustained and suffered as a result of Purchaser's default. In the event of Purchaser's default and forfeiture of Escrow Deposit funds, Seller and Purchaser shall be released from all further obligations under this Agreement. The provisions set forth in this Section 18 for liquidated and agreed-upon damages are intended as a pre-default estimate of Seller's actual damages and are not intended as a penalty, and Purchaser understands and acknowledges that by reason of the withdrawal of the Unit from sale to the general public, at times when other potential purchasers would be interested in buying the Unit, that Seller will have sustained real economic damages if Purchaser defaults, which damages will be substantial but will not be capable of determination with mathematical precision and, therefore, the provision for liquidated and agreed-upon damages has been incorporated into this Agreement as a provision beneficial to both parties.

19. **Seller's Default**. In the event that Seller defaults in the performance of its obligations under this Agreement, Purchaser shall be entitled to the return of its Escrow Deposit, together with any interest accrued thereon, and, thereafter Purchaser may seek all other remedies available at law or in equity.

20. **Multiple Purchasers**. If two or more persons are collectively named as Purchaser herein, any one of them is hereby authorized to act as the agent for all others, with the power to legally bind the others in all matters related to this Agreement. If Purchaser is married, and Purchaser's spouse is not named as one of the persons constituting Purchaser in this Agreement, Purchaser shall be responsible and liable for such spouse executing the mortgage and other closing documents as required by Purchaser's lender. Failure of Purchaser's spouse to do so shall constitute a material default by

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials: ____

Purchaser under this Agreement.

21.   **Notices**.  Notices to either party shall be properly given when transmitted in writing by: (a) certified U.S. mail, return receipt requested, with sufficient postage affixed; (b) nationally-recognized overnight courier service; or (c) personal delivery (including same-day courier service). Unless otherwise provided in this Agreement, notice shall be deemed to have been given on the third (3rd) business day following deposit with the U.S. Postal Service if transmitted by certified U.S. mail, or on the date of actual delivery if transmitted by overnight courier service or personal delivery.  Notice to one person acting as agent or one of several persons constituting Purchaser shall be deemed to be valid notice to all others.  Notices shall be addressed as follows:

| | |
|---|---|
| For Seller: | Royal Palm Miami Holdings, LLC |
| | c/o Royal Palm Communities |
| | 1499 West Palmetto Park Road, Suite 200 |
| | Boca Raton, FL  33486-3321 |
| | Attention: Controller |
| | |
| With a copy to: | Terra Title Corporation |
| | 701 West Cypress Creek Road, Suite 303 |
| | Fort Lauderdale, FL  33309-2045 |
| | Attention: Steven A. Amster, Esq. |
| | |
| For Purchaser: | At Purchaser's address shown on the first page of this Agreement. |

Any party may designate a different address for purpose of notices by providing written notice to the other parties in the same manner provided above.

22.   **Access to Unit**.  Except as provided in Section 12, Purchaser shall not have access or entry to the Unit, nor shall Purchaser store any of Purchaser's possessions in or about the Unit or the Condominium Property before the Closing.  Purchaser shall not interfere with workmen during working hours, nor enter upon the job site, and all matters pertaining to the construction of the Unit shall be presented by Purchaser directly to Seller's authorized sales agent and its representatives.

23.   **Seller's Use of Property**.  Seller hereby reserves the right to use the Condominium Property and the Common Elements thereof for the promotion of sales or leases of other units within the Condominium which are owned by Seller and its successors and assigns.  Seller's promotional uses may include, without limitation, the maintenance of a sales office, the maintenance of model units, the display of promotional signs, and the showing of unsold Units to prospective purchasers.  If other units owned by Seller remain unsold at the time of the Closing, Seller may lease such unsold Units to tenants selected by Seller, and Seller may subsequently sell such units to purchasers acceptable to Seller.

24.   **Radon Gas Disclosure**.  As required by Section 404.056(8), FLA. STAT. (2005), Seller hereby provides Purchaser with notice that "radon is a naturally occurring radioactive gas that when it has accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time.  Levels of radon that exceed Federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials:

your county health unit."

25.    **Risk of Loss**.  Seller shall bear the risk of loss until the Closing is consummated.

26.    **Assignment by Purchaser**.  Purchaser may not assign all or any portion of its right, title or interest in this Agreement, without the express written consent of Seller, which consent may be withheld in Seller's sole discretion.  Notwithstanding the foregoing, Purchaser may freely assign its entire interest in this Agreement to a qualified intermediary pursuant to the terms of a written like-kind exchange agreement in accordance with 26 U.S.C. § 1031 and the U.S. Treasury Regulations promulgated thereunder, and Seller agrees to cooperate in such exchange provided that there is no delay in the Closing date and there is no additional expense to Seller.

If Purchaser is a corporation, limited liability company, partnership or other form of business entity, neither Purchaser nor its equity owners may sell, transfer or assign any of the equity ownership interests in Purchaser before the Closing without the express written consent of Seller in accordance with this Section 26.

27.    **Resale of Unit**.  Purchaser may not resell the Unit or to enter into an agreement to resell the Unit before the Closing.  Any attempt by Purchaser to resell the Unit or to enter into an agreement to resell the Unit before the Closing shall be deemed to be null and void, and this provision shall be deemed to be a covenant for the benefit of Seller and Seller shall be entitled to enforce such covenant by specific performance.

28.    **Binding Agreement**.  This Agreement shall be binding upon, and shall inure to the benefit of, Seller and Purchaser's respective heirs, personal representatives, successors and permitted assigns, as applicable.

29.    **Entire Agreement**.  Seller and Purchaser agree that all prior conversations, negotiations, understandings and agreements are superseded by this Agreement.  No representations, claims, statements, inducements, advertising, brochures, promotional activities, maps or other materials, given by Seller or Seller's agents shall be of any force and effect unless expressly set forth in this Agreement or in the Condominium Documents.  The provisions of this Section 29 shall survive the Closing or the earlier termination of this Agreement.  Upon the consummation of the Closing, Purchaser's acceptance of a special warranty deed shall be deemed to be acknowledgment of Seller's full performance of its obligations under this Agreement, and further deemed to be a discharge of every agreement, obligation, and representation made by Seller or Seller's agents, in accordance with the terms and conditions of this Agreement.  No prior agreement or representation shall survive the delivery and acceptance of the deed, except as expressly set forth in this Agreement, or in writing at or before the Closing.

30.    **Addendum**.  An Addendum signed by Seller and Purchaser and attached to this Agreement may set forth certain Upgrades to be included in the Unit, or other special modifications of this Agreement requested by Purchaser.  An Addendum, if signed and attached, is incorporated herein by this reference.  Seller shall have no obligation to provide any Upgrade unless such Upgrade is specified in a written Addendum attached hereto.

31.    **Amendments**.  No amendment of this Agreement shall be binding unless it is in writing

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials:

and signed by the parties.  Attempted oral amendments shall be void and without effect.

32.    **Choice of Law**.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida.

33.    **Choice of Venue**.  In the event that either Seller or Purchaser initiates litigation arising from this Agreement, the relationship of the parties hereunder, or the subject matter hereof, the only proper venue shall be in the Circuit Court in and for Miami-Dade County, Florida.

34.    **Attorneys' Fees**.  If either Purchaser or Seller files suit to enforce their rights under this Agreement, the non-prevailing party shall pay all reasonable attorneys' fees and costs, including those related to any appeal or bankruptcy, incurred by the prevailing party.  Seller shall also be entitled to collect all attorneys' fees actually incurred before the Closing to enforce the terms and conditions of this Agreement.

35.    **Severability**.  If a court of competent jurisdiction, as identified in Section 33 above, determines that any provision of this Agreement is unenforceable, the unenforceability of such provision shall not affect the validity or enforceability of any other provision of the Agreement.

36.    **Captions & Headings**.  The captions and headings at the beginning of each section or paragraph of this Agreement are intended solely for convenience of reference, and are not intended to limit, interpret or otherwise construe the text of this Agreement.

37.    **Consideration for Agreement**.  Purchaser acknowledges and agrees that the primary inducement to purchase and consideration for the Unit under this Agreement is the Unit itself.

38.    **Dates for Performance**.  If the date for the performance of any action under this Agreement shall fall on a Saturday, Sunday or legal holiday, such action shall, and may, be performed before 5:00 p.m. on the next succeeding business day that is not a Saturday, Sunday or legal holiday.  The term "day" as used and described in this Agreement shall refer to calendar days, unless otherwise specifically provided.

39.    **Time is of the Essence**.  Time is of the essence in Purchaser's performance of Purchaser's respective obligations under this Agreement.

40.    **Counterparts**.  This Agreement maybe executed in two or more counterparts, each of which shall be deemed to be an original, and all such counterparts together shall constitute one and the same instrument.

41.    **Effective Date**.  The Effective Date of this Agreement shall be the date that Seller executes this Agreement and delivers a signed counterpart hereof to Purchaser, as shown by the date set forth adjacent to Seller's signature below.

42.    **Real Estate Brokers**.  Each of Seller and Purchaser warrants and represents to the other that no real estate broker or agent is involved in this purchase and sale, other than Majestic Properties Miami, Inc. ("**Seller's Broker**"), and ___Julret Odco / Majestic_____

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Page 12

Purchaser's initials: _____

("**Cooperating Broker**"), and each of Seller and Purchaser further agrees to indemnify and hold the other harmless against all claims of other real estate brokers or agents arising from the acts of omissions of the indemnifying party or its authorized agents.  Seller shall pay any commission collectively due Seller's Broker and Cooperating Broker; provided, however, that the commission paid to Cooperating Broker shall not exceed four percent (4.00%) of the Purchase Price.

43.    **Construction Industries Recovery Fund**.  Pursuant to Section 489.1425, FLA. STAT. (2005), Seller provides Purchaser with the following notice:  Payment may be available from the Construction Industries Recovery Fund if you lose money on a project performed under contract, where the loss results from specified violations of Florida law by a state-licensed contractor.  For information about the recovery fund and filing a claim, contact the Florida Construction Industry Licensing Board at the following telephone number and address (850) 487-1395, CILB Recovery Fund, 1940 North Monroe Street, Suite 60, Tallahassee, Florida 32399-2292.

44.    **Remedies Regarding Construction Defects**.  In accordance with Florida law, Seller provides Purchaser with the following notice:  Florida law contains important requirements you must follow before you may file a lawsuit for defective construction against a contractor, subcontractor, supplier, or design professional for an alleged construction defect in your home.  Sixty days before you file your lawsuit, you must deliver to the contractor, subcontractor, supplier, or design professional a written notice of any construction conditions you allege are defective and provide your contractor and any subcontractors, suppliers, or design professionals the opportunity to inspect the alleged construction defects and make an offer to repair or pay for the alleged construction defects.  You are not obligated to accept any offer made by the contractor or any subcontractors, suppliers, or design professionals.  There are strict deadlines and procedures under Florida law.

If Purchaser rejects any settlement offer made pursuant to such Florida law by Seller or other contractors, subcontractors, suppliers or design professionals hired by, through or under Seller or its affiliates (collectively, "**Protected Parties**"), and Purchaser elects to proceed with an action against one or more Protected Parties, Purchaser acknowledges that all provisions of this Agreement respecting such disputes remain in full force and effect.

45.    **Receipt of Condominium Documents**.  By initialing this Section 41, Purchaser acknow-ledges Purchaser's receipt of the Prospectus, the Declaration of Condominium, the Articles of Incorporation, the Bylaws, the Rules & Regulations and the other Condominium Documents required by Section 718.503, FLA. STAT. (2005), to be delivered to Purchaser by Seller.

Purchaser's initials: _____ / Purchaser's initials: _____

THIS AGREEMENT IS VOIDABLE BY PURCHASER BY DELIVERING WRITTEN NOTICE OF PURCHASER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY PURCHASER, AND RECEIPT BY PURCHASER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO PURCHASER BY SELLER UNDER SECTION 718.503, FLORIDA STATUTES.  THIS AGREEMENT IS ALSO VOIDABLE BY PURCHASER BY DELIVERING WRITTEN NOTICE OF PURCHASER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM SELLER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO PURCHASER.  ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials: _____

EFFECT. PURCHASER MAY EXTEND THE TIME FOR THE CLOSING FOR A PERIOD OF NOT MORE THAN FIFTEEN (15) DAYS AFTER PURCHASER HAS RECEIVED ALL OF THE ITEMS REQUIRED. PURCHASER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT THE CLOSING.

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY SELLER TO PURCHASER OR A LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO SELLER PRIOR TO THE CLOSING PURSUANT TO THIS AGREEMENT MAY BE USED FOR CONSTRUCTION PURPOSES BY SELLER.

PURCHASER HAS THE OPTION TO CANCEL THIS AGREEMENT BY NOTICE TO SELLER UNTIL MIDNIGHT OF THE FIFTEENTH (15TH) DAY FOLLOWING THE SIGNING OF THIS AGREEMENT.

IN WITNESS WHEREOF, each of Purchaser and Seller has executed, or has caused their respective duly authorized representative to execute, this Agreement as of the dates set forth below.

PURCHASER:

Signature: _____

Printed name: AGNOP XAMOr

Social Security Number: 210 36 0820

Date: 5/19/05

PURCHASER:

Signature: _____

Printed name: LEAtRiCe Damus

Social Security Number: 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

Date: 5-19-05

[*Signatures continued on the following page of this Agreement.*]

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Page 14

Purchaser's initials: _____

*[Signatures continued from the preceding page of this Agreement.]*

**SELLER:**
ROYAL PALM MIAMI HOLDINGS, LLC,
a Florida limited liability company

By: _____

Printed name: David Temkin – Controller

Date: 5/31/05

**COOPERATING BROKER:**

By: _____

Printed name: _____

Date: _____

*I have completed the information required by
Section 42 above.*

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials: _____

PARAMOUNT BAY, A CONDOMINIUM
ADDENDUM TO CONDOMINIUM UNIT PURCHASE & SALE AGREEMENT

THIS ADDENDUM TO CONDOMINIUM UNIT PURCHASE & SALE AGREEMENT (this "**Addendum**"), dated to be effective as of the Effective Date, is made by and between Seller and Purchaser, and modifies the Condominium Unit Purchase & Sale Agreement of the same date as this Addendum (the "**Agreement**").

1.      **Relationship to Agreement**.  This Addendum modifies and amends the Agreement regarding the matters addressed herein.  To the extent that the provisions of this Addendum conflict with those found in the main body of the Agreement, the provisions of this Addendum shall supersede such conflicting provisions of the Agreement.

2.      **Correct Unit Number**.  Purchaser has agreed to buy and accept the Unit, which is a Type B2 Unit, located on the ___17th___ floor of the Condominium building.  Notwithstanding any other provision of the Agreement, the Prospectus, the Condominium Documents, the sales brochure or the other sales materials provided to Purchaser, the Unit's correct Unit Number is ___1706___, as shown on the Plot Plan and Unit Floor Plan Exhibits provided in the Condominium Documents.  The Plot Plan shows the configuration of the Unit and the Unit's location on the identified floor of the Condominium building relative to the other Units on the same floor.  The Unit is correctly identified on the photocopies of the Plot Plan and the Floor Plan attached to the Agreement as **Exhibit B**, and the Unit is shown highlighted in yellow marker ink on the photocopy of the Plot Plan provided

3.      **Correct Unit Floor Area**.  Purchaser has agreed to buy and accept the Unit, which is a Type B2 Unit.   Notwithstanding any other provision of the Agreement, the Prospectus, the Condominium Documents, the sales brochure or the other sales materials provided to Purchaser, the floor area of the typical Type B2 Unit is 1,804 square feet, and the Unit shall be deemed to include this number of square feet for all purposes under the Condominium Documents, including the allocation of the Assessments applicable to the Unit.  The floor area of the Unit, as actually constructed, is subject to minor deviations of up to two percent (2.00%) of the stated floor area of the Unit, based upon variations in field conditions, minor structural variations in the design of Condominium building, and the Condominium building as actually constructed.   No adjustments of the Purchase Price or the Assessments applicable to the Unit will be made for any such minor variations in the square footage of the Unit as actually constructed.

*Paramount Bay, A Condominium*
*Condominium Unit Purchase & Sale Agreement*

Purchaser's initials: _____

# PARAMOUNT BAY, A CONDOMINIUM

**Exhibit B**

BALCONY

TYPE: D
UNIT: 701-3601

BALCONY

ELEV ELEM

TYPE: E
UNIT: 702-3602

TYPE: C2
UNIT: 703-3603

ELEV

BALCONY

BALCONY

TYPE: A4
UNIT: 704-3604

ELEV

BALCONY

STAIR

TYPE: A3
UNIT: 705-3605

ELEV

BALCONY

BALCONY

TYPE: B2
UNIT: 706-3606

BALCONY

TYPE: B1
UNIT: 707-3607

ELEV

BALCONY

TYPE: A2
UNIT: 708-3608

ELEV

TYPE: A1
UNIT: 709-3609

STAIR

ELEV

TYPE: C1
UNIT: 710-3610

BALCONY

BALCONY

SEE NOTE "E"

**LEGEND:**

CONDOMINIUM UNIT
BOUNDARY LINE

COMMON ELEMENT
BOUNDARY LINE

RESIDENTIAL LIMITED
COMMON ELEMENT

NOTES:

Each Condominium Unit consists of the space bounded by the Condominium Unit boundary lines by:

(A) Upper Boundaries. The horizontal plane of the unfinished lower surface of the structural ceiling of the unit.
(B) Lower Boundaries. The horizontal plane of the unfinished upper surface of the concrete floor of the unit.
(C) Perimeter Boundary. The perimeter boundary of the unit shall be the vertical planes of the unfinished interior surfaces of the wall bounding the unit extended to their planar intersections with each other and with the upper and lower boundaries.
(D) There may exist some variation between the proposed improvements and the improvements as constructed.
(E) Balconies extend an additional 3'-0" every 5 floors in stepping pattern as per elevations.



20    0    20    40
SCALE: 1:40

## 7TH-36TH LEVEL FLOOR PLAN
## (13th Level Excluded)

SHEET